Case No. 13-8520
UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA

In Re: Stephen Thomas Yelverton   )
                                  )
    Respondent                    )

RESPONSE TO ORDER TO SHOW CAUSE

COMES NOW, Respondent Stephen Thomas Yelverton, and hereby timely responds to the Order, filed November 5, 2013, to Show Cause by December 5, 2013, why the imposition of identical Discipline from the D.C. Court of Appeals would be unwarranted. In response, the following shown.

Statement of the Facts

1. Respondent Yelverton has been a member of the Bar of the U.S. Court of Appeals since 1974 and the D.C. Bar since 1979, with an unblemished record. He is rated AV Preeminent by Martindale for the very highest in legal ethics and legal ability.

2. The Suspension from the practice of law by the D.C. Courts of Appeals on September 17, 2013, was a preliminary ruling and not on the merits. Oral Argument and a final decision on the merits by the D.C. Court of Appeals will not be made until sometime in the first quarter of 2014.

3. The Specification of Charges, executed July 11, 2011, by the Office of Bar Counsel ("OBC"), are based entirely upon Yelverton's Pro Bono (substantially reduced rate) representation and defense of his client, Michael Snow. He was the victim of criminal assault through "gay bashing" by Mary Carrick. She is physically larger, and grabbed his face and repeatedly called him a "faggot" at a public event in March 2009.

4. Snow filed a "hate" crime charge against Carrick with MPD in March 2009. She was represented by Attorney Kirk Callan Smith, who had a long social and professional relationship with Snow, and was then engaged in an ongoing personal feud with him. See, attached Ex. 3.

5. Attorney Smith took great offense in Snow filing a "hate" crime charge against Carrick for "gay bashing" in view of Snow <u>not</u> being "gay." However, a violation of D.C. Code, Section 22-3701 (1) and (2), can be based upon "perceived" sexual orientation and <u>not</u> actual orientation.

6. In June 2009, Yelverton assisted an unrelated female client of Smith in filing a criminal charge against him with MPD for holding his client captive in his law office/residence for some two weeks in May 2009, and criminally abusing her. Yelverton also assisted her in filing with OBC a Bar Complaint against Smith. However, OBC <u>refused</u> to consider any Bar Complaints against Smith for any alleged ethics or criminal violations.

2

7. Attorney Smith has long been associated, as an "outside" informant and investigator, for some 20 years with OBC and with its affiliate, the Board of Professional Responsibility ("BPR").

8. In July 2009, Attorney Smith <u>involuntarily</u> drew Yelverton into the Carrick criminal proceeding to be counsel of record for Snow, as the government witness.

9. Attorney Smith personally served on Yelverton a criminal court Subpoena for him to turnover all of Snow's confidential financial records for Smith and Carrick to peruse. This required Yelverton to make a Notice of Appearance for Snow in the Carrick criminal proceeding to Quash the Subpoena, and thus made Snow a party for purposes of defending himself against attacks by Carrick and Attorney Smith.

10. Attorney Smith was <u>not</u> known to have ever served as defense counsel in a criminal proceeding. He vowed to "flip" the criminal charges on Snow and have him criminally indicted for making supposed false charges against Carrick and for supposed false testimony against her.

11. In his cross-examination of Snow at the Carrick criminal trial in Case No. 2009 CMD 9194, on August 17, 2009, Attorney Smith repeatedly called Snow a "liar and criminal," only based upon his personal opinion, with <u>no</u> supporting evidence.

12. Attorney Smith had Yelverton <u>recused</u> from the trial on the basis of being called as a witness. This was in spite of Yelverton having <u>no</u> personal knowledge of the incident, and not <u>even</u> knowing Snow at the time.

13. In a non-Jury trial, the Judge made an Oral Ruling that acquitted Carrick, and also made adverse findings of fact attacking the testimony of Snow, as the government witness.

14. Carrick and Attorney Smith obtained expedited copies of the trial transcripts and handed out excerpts as "party favors," and sent the excerpts in e-mail blasts to hundreds. They suggested that the Judge believed Snow to be "gay," and would soon have Snow criminally indicted for supposed false testimony and filing false criminal charges against Carrick.

15. One of the recipients of the e–mail blasts was Craig Moran, who was a friend of Carrick. He contacted Snow and said that Carrick had admitted to him soon after the incident that she had bashed Snow.

16. Moran executed an Affidavit on August 24, 2009, which was the due date for a Motion for a new Trial under SCR-Criminal, Rule 33.

17. Yelverton filed a "Request for the Judge to <u>Sua Sponte</u> Declare a Mistrial," for the benefit of Snow to vacate the Oral Ruling attacking his trial testimony. This request was in compliance with SCR-Criminal, Rule 57 (b), and was intended to protect Snow from the Oral Ruling being final.

**4**

18. The Moran Affidavit was also submitted by Yelverton, as an Officer of the Court, to inform the Judge of evidence of perjury having been committed by Carrick in his Courtroom, which is a new and <u>different</u> crime by her that had <u>not</u> been prosecuted.

19. The Judge denied the Request for him to <u>Sua Sponte</u> Declare a Mistrial to vacate his Oral Ruling attacking Snow.  Attorney Smith then began attacking Yelverton as having somehow violated the Double Jeopardy rights of Carrick, and for somehow having <u>no</u> right of "standing" to make any filings on behalf of Snow to defend him from attacks by Smith.

20. Yelverton responded to defend his client, Snow, and himself from attacks by Attorney Smith.  This resulted in a post-trial "pleading war" initiated by Smith, who filed Motions for Sanctions against Yelverton for submitting the Moran Affidavit to the Judge.  At the same time, Smith was submitting Bar Complaints to OBC making the <u>same</u> allegations and charges against Yelverton for submitting the Moran Affidavit to the Judge.

21. The Judge issued an <u>Order</u>, filed March 15, 2010, denying all Motions by Attorney Smith and imposing <u>no</u> Sanctions on Yelverton.

22. Yelverton filed on March 26, 2010, a Notice of Appeal to the D.C. Court of Appeals.  The purpose was to Vacate the Oral Rulings by the Judge attacking Snow's trial testimony, and protect him from criminal indictment.

5

23. This Notice of Appeal was in accordance with <u>Anders v. State of California</u>, 386 U.S. 738, 743 (1967), which <u>requires</u> counsel to seek full appellate review, even if the Appeal has <u>no</u> merit, where his client is under threat of criminal charges.

24. On March 29, 2010, OBC formally instituted Bar Docket No. D128-2010. It was based upon Attorney Smith's Bar Complaints against Yelverton for defending Snow against attacks by Smith, and where Yelverton was accused of filing a "frivolous" Appeal for Snow.

25. On April 15, 2010, Attorney Smith filed a Notice of Appeal with respect to the denial of his Motions for Sanctions against Yelverton by the Trial Judge. Smith then filed additional Motions for Sanctions against Yelverton with the D.C. Court of Appeals complaining about Yelverton submitting the Moran Affidavit to the Judge and about Yelverton having <u>no</u> right of "standing" to defend his client, Snow, against attacks by Smith.

26. On June 7, 2010, the D.C. Court of Appeals <u>denied</u> the Motions for Sanctions against Yelverton that had been filed by Attorney Smith, and imposed <u>no</u> Sanctions on Yelverton. It directed OBC to "<u>investigate</u>" both Smith and Yelverton for their actions in the Carrick criminal proceeding. OBC has acknowledged that it <u>refused</u> to investigate Smith.

27. On May 13, 2011, Attorney Smith sent an e-mail to Phil Fox of OBC and demanded that Specification of Charges be brought against Yelverton because the D.C Court of Appeals has refused to do so. See, attached Ex. 4.

28. Fox executed under penalty of perjury the Specification of Charges against Yelverton on July 11, 2011, where Fox had <u>no</u> personal knowledge. The Charges were entirely based upon the Motions for Sanctions that had been <u>denied</u> by the D.C. Court of Appeals and upon the <u>identical</u> Bar Complaints against Yelverton that Attorney Smith had filed with OBC.

29. However, the Specification of Charges did <u>not</u> identify any Complainant or witnesses. They carried Bar Docket No. D128-2010 which is the Docket formally instituted by OBC on March 29, 2010, and was prior to the D.C. Court of Appeals hearing any matters in the Appeal filed by Yelverton on March 26, 2010.

30. The Hearing on the Specification of Charges was held before an Ad Hoc Committee on February 1, 2012. The members are practicing attorneys and members of the public who are unaffiliated with OBC or BPR.

31. OBC <u>misrepresented</u> that Attorney Smith had <u>no</u> involvement in the Specification of Charges, and <u>refused</u> to call him as a witness. Yelverton called Smith to testify, but was in <u>hiding</u> in California and did <u>not</u> appear.

7

32. OBC represented that the D.C. Court of Appeals had ordered it to bring the Charges against Yelverton. Thus, it would un-Constitutionally be "both Prosecutor and Judge." Gibson v. Berryhill, 411 U.S. 564, 577 (1973).

33. OBC has the Burden of Proceeding with the evidence and the Burden of Proof with "clear and convincing" evidence.

34. OBC declined to call as a witness, the client of Yelverton, Snow, who its Specification of Charges alleged was somehow harmed by Yelverton's representation of him in submitting the Moran Affidavit to the Judge. This was the focus of OBC's attack on Yelverton at the Hearing.

35. Because of Yelverton's submission of the Moran Affidavit to the Judge, Attorney Smith was unable to get Yelverton's client, Snow, indicted for false testimony against Carrick, or for filing a false police report.

36. Yelverton's client, Snow, had made no complaints to OBC or anyone against Yelverton as to his representation. Snow was billed only $3,000 for over $20,000 in time, and submitted a Statement in support of Yelverton at the conclusion of the Hearing. See, attached Ex. 3.

37. The Ad Hoc Committee ruled in favor of Yelverton and found that he had committed no violation of any of the Rules of Professional Conduct. It made "credibility" findings that Yelverton's actions in defense of his client, Snow, were "sincere" and "deeply felt."

**8**

38. The Ad Hoc Committee moreover made findings of fact that Yelverton's client, Snow, had suffered <u>no</u> harm, that Carrick had suffered <u>no</u> harm, and that the Court processes had suffered <u>no</u> harm from Yelverton's actions in defending Snow against attacks by Attorney Smith, and that OBC had presented <u>no</u> evidence of fraud, dishonesty, or bad faith by Yelverton in defending his client, Snow, from attacks by Attorney Smith.

39. On March 11, 2013, Yelverton filed a Federal lawsuit against OBC for Constitutional violations under 42 U.S.C. 1983 by engaging in "retaliatory prosecution" and "obstruction of justice." Such "bad faith" and "harassment" of Yelverton by OBC is a legally recognized exception to <u>Younger</u> Abstention under <u>Middlesex Ethics Comm. v. Garden State Bar Ass'n</u>, 457 U.S. 423, 435 (1982).

40. These claims of "bad faith" and "harassment" by OBC are based in substantial part on the Affidavit of Rebecca Landrith, executed June 8, 2012, upon personal knowledge, that OBC acted in concert with Attorney Smith to bring the Specification of Charges in "retaliation" against Yelverton. See, attached Exs. 1 and 2, and attached Ex. 5, Yelverton Affidavit.

41. Yelverton commenced his Federal lawsuit against OBC on March 11, 2013, which was <u>prior</u> to an adverse ruling by BPR on July 30, 2013. The ruling was in "retaliation" for Yelverton making his Federal claims.

**9**

42. BPR and OBC are closely associated, as integral units of the D.C. Court of Appeals, and have <u>no</u> independent public members, such as does the Ad Hoc Committee.

43. BPR <u>improperly</u> imposed a Fitness Requirement on Yelverton, without any basis in fact or law, which mandates his automatic Suspension from the practice of law <u>prior</u> to a final decision on the merits of an Appeal to the D.C. Court of Appeals.

<u>The Requirements for a Stay of Reciprocal Discipline are met</u>

44. All the requirements are met to Stay any Reciprocal Discipline until a final decision on the merits is rendered by the D.C. Court of Appeals. Such a final decision on the merits is expected in the first quarter of 2014.

45. The purpose of a Stay is to preserve the status quo of the parties until a final decision is made. <u>CFGC v. England</u>, 454 F.3d 290, 297 (D.C. Cir. 2006).

46. The consideration of a Stay "does <u>not</u> involve a final determination on the merits of the litigation, but rather the sound exercise of judicial discretion on the need for interim relief." <u>NOW v. Soc. Sec. Admin.</u>, 736 F.2d 727, 733 (D.C. Cir. 1984).

47. A Stay may be granted based on less formal procedures and on less extensive evidence than a Trial on the merits, but if there are genuine

issues of material facts raised in an opposition, an evidentiary Hearing is required, and where there are credibility determinations to be made, it is an abuse of discretion for the Court to settle the question on the basis of documents alone, without an evidentiary Hearing. Cobell v. Norton, 391 F.3d 251, 261 (D.C. Cir. 2004).

48. In considering a Stay, the Court must set forth its consideration of the factors and its attendant conclusions of law, as required by Fed. R. Civ. P., Rule 52 (a), in order to "determine whether the Court properly carried out its charge to weigh the factors with one another." Gordon v. Holder, 632 F.3d 722, 724 (D.C. Cir. 2011).

49. The legal standards for grant of a Stay are stated in Council on American-Islamic Relations v. Gaubetz, 667 F.Supp.2d 67, 74 (D.D.C. 2009), where the Court may use a sliding scale, as to which a particularly strong showing in one area can compensate for weakness in another.

(a) Substantial Likelihood of Success on the Merits

50. Yelverton has a substantial likelihood of success on the merits in his claims before the D.C. Court of Appeals.

51. The Report and Recommendation of BPR, issued July 30, 2013, makes the recommendation that Yelverton be suspended from the practice of law based upon Court filings that he made in defense of his client from the

**11**

threats of criminal indictment, which OBC and BPR somehow considered "frivolous," in violation of Rule 3.1, although his client was successfully defended by Yelverton and suffered <u>no</u> indictment.

　　52.　D.C. Ethics Opinion No. 320, and Comment 3 of Rule 3.1, requires Absolute <u>Immunity</u> from Sanctions for attorneys in making what might be considered "frivolous" filings in defending their clients from threats of criminal indictment. See also, <u>Restatement (Third) of Law Governing Lawyers</u>, Section 110 (2000). The public policy purpose of this <u>Immunity</u> from Sanctions is to allow an attorney to exercise to the fullest the Fifth Amendment right of his client to defend himself, with <u>no</u> "chilling" effect from the threats of Sanctions.

　　53.　This <u>Immunity</u> from Sanctions in criminal defense was affirmed as the policy of the D.C. Bar in a CLE seminar held on April 19, 2012. Attendance at such CLE seminars is a typical recommendation by BPR for attorneys found to have violated an ethics Rule, and thus CLE is <u>authoritative</u> as to the meaning of ethics Rules.

　　54.　Yelverton also has Absolute <u>Immunity</u> from Sanctions under the <u>Noerr-Pennington</u> Doctrine for "civil" filings. <u>Nader v. Democratic National Comm</u>., 567 F.Supp.2d 692, 696 (D.D.C. 2009), citing to <u>Cal. Motor Transp. Co. v. Trucking Unlimited</u>, 404 U.S. 508, 510 (1972).

**12**

55. The "sham" exception to the Noerr-Pennington Doctrine would not be applicable because the Ad Hoc Committee made findings of fact that Yelverton's filings in defense of his client, Snow, were not "dishonest," and the Report and Recommendation of BPR made no findings of fraud or dishonesty by Yelverton in defending his client. United States v. American Tel. & Tel. Co., 524 F.Supp. 1336, 1364 (D.D.C. 1981).

56. The Absolute Immunity for Sanctions under the Noerr-Pennington Doctrine would also extend to other alleged violations of the Rules of Professional Conduct that are related to Yelverton's "good faith" filings in defense of his client, Snow, from attacks by Attorney Smith.

57. The Specification of Charges alleged and the Report and Recommendation found that Yelverton violated Rule 1.1 (a) and (b) by his filings in the criminal proceeding somehow putting his client, Snow, at risk for being sued by Carrick and Attorney Smith. However, Snow would have Absolute Immunity under the Noerr-Pennington Doctrine from being sued.

58. In In Re Drew, 693 A.2d 1127, 1132 (D.C. 1997), a violation of Rule 1.1 (b) was found because the attorney had failed to file a Notice of Appeal in a criminal defense matter, even though it might be hopeless, and cited in support to Anders v. State of California, id., requiring such a filing, although hopeless.

**13**

59. The BPR found that Yelverton had violated Rule 1.1 (b) by filing an Appeal for Snow in a criminal defense matter that it considered somehow hopeless. However, as demonstrated above, BPR has wholly <u>inverted</u> established precedent. <u>Drew</u>, <u>id</u>.

60. In D.C. Ethics Opinion No. 320, <u>Anders</u>, <u>id</u>., is cited with favor to support the requirement of an attorney to make filings on behalf of his client in criminal defense matters that may be considered "frivolous."

61. With being required under D.C. Ethics Opinion No. 320 to make what may be considered "frivolous" filings in the criminal defense of his client, Yelverton could <u>not</u> as a matter of law have violated Rule 1.1 (a) and (b), which requires having the requisite skill and care for competent representation, so as to <u>not</u> make otherwise "frivolous" filings.

62. Where there is a <u>first</u> violation of Rules, such as 1.1 (a) and (b), there is <u>no</u> Suspension, unless dishonesty or serious harm to the client is demonstrated by "clear and convincing" evidence. <u>In Re Sumner</u>, 665 A.2d 986, 990 (D.C. App. 1995).

63. Yelverton has <u>no</u> prior violations, and the Ad Hoc Committee made findings of fact that he caused <u>no</u> harm to client, Snow, or to Carrick, or to the Court processes, and that OBC had presented <u>no</u> such evidence.

64. "Serious interference with the administration of justice" is a violation of Rule 8.4 (d), which is conduct by an attorney that is considered "<u>reprehensible</u>" to the practice of law. <u>In Re Uchendu</u>, 812 A.2d 933, 940 (D.C. 2002).

65. With the "credibility" finding by the Ad Hoc Committee that Yelverton's defense of his client, Snow, was "sincere' and "deeply felt," and with findings of fact that he caused <u>no</u> "harm" to anyone and engaged in <u>no</u> "dishonesty" or "bad faith" in protecting Snow from attacks by Attorney Smith, there is <u>no</u> factual and legal basis whatsoever that Yelverton did anything that could be considered even remotely "reprehensible."

66. The BPR "must defer to the Ad Hoc Committee's factual findings and view the record in the light most favorable to those findings." <u>In Re Godette</u>, 919 A.2d 1157, 1164 (D.C. 2007). The BPR and the D.C. Court of Appeals must accept the Ad Hoc Committee's "credibility" findings. <u>In Re Soininen</u>, 853 A.2d 712, 725 (D.C. 2004).

67. Accordingly, with the uncontroverted "credibility" findings and findings of fact and with established case law all in favor of Yelverton, he would have a substantial likelihood of prevailing on the merits in his claims before the D.C. Court of Appeals. There are simply <u>no</u> facts and <u>no</u> law to the contrary.

68. The Specification of Charges and the Report and Recommendation are moreover absolutely <u>barred</u> by Res Judicata. They are based entirely upon Motions for Sanctions filed by Attorney Smith against Yelverton as to the <u>same</u> "nucleus of facts," which were <u>denied</u> by the D.C. Court of Appeals in 2010 in favor of Yelverton.

69. Accordingly, with Res Judicata, Yelverton would have a substantial likelihood of prevailing on the merits before the D.C. Court of Appeals, which has previously ruled in his favor as to the <u>same</u> matters.

70. A substantial likelihood of prevailing on the merits is found where a government agency has acted in an arbitrary and capricious manner by treating similarly situated persons differently. <u>Bracco Diagnostics, Inc. v. Shalala</u>, 963 F.Supp. 20, 27-28 (D.D.C. 1997). OBC and BPR have treated Yelverton differently and far more harshly from others for <u>no</u> valid reason.

71. Even if Yelverton is found to have violated, Rules 1.1 (a) and (b), Rule 3.1, and 8.4 (d), the facts and established case law would <u>not</u> require the imposition of any Suspension from the practice of law. A Suspension is required <u>only</u> where there is a finding of dishonesty, fraud, or serious harm to a client or other person. <u>In Re Zelloe</u>, 686 A.2d 1034, 1036-1037 (D.C. App. 1996). The Ad Hoc Committee found <u>no</u> dishonesty, fraud, or harm by Yelverton, and made favorable "credibility" findings as to him.

72. The D.C. Court of Appeals must impose <u>consistent</u> dispositions for <u>comparable</u> conduct. <u>In Re Artis</u>, 883 A.2d 83, 92 (D.C. 2005).

73. OBC and BPR contend that a 90-day Suspension, with a Fitness Requirement, must be imposed on Yelverton, and cited in support only to <u>In Re Thyden</u>, 877 A.2d 129 (D.C. 2005) and <u>In Re Spikes</u>, 881 A.2d 1118 (D.C. 2005), as to supposed comparable conduct.

74. However, in <u>Thyden</u> the attorney filed "frivolous" pleadings in a Bankruptcy on behalf of a person who was <u>not</u> his client, engaged in dishonesty, and caused serious harm to other parties. Even with such dishonesty and harm, the attorney was Suspended for only 30-days, with <u>no</u> Fitness Requirement. Thus, based upon <u>Thyden</u>, Yelverton could have <u>no</u> Suspension, and <u>no</u> Fitness Requirement, imposed on him.

75. In <u>Spikes</u>, the attorney litigated a civil lawsuit, which was <u>barred</u> by absolute privilege, against a person who had filed the Bar Complaint. Even with such bad faith and harm, the attorney was Suspended for only 30-days, with <u>no</u> Fitness Requirement. Thus, based upon <u>Spikes</u>, Yelverton could have <u>no</u> Suspension and <u>no</u> Fitness Requirement, imposed upon him.

76. It is the Fitness Requirement <u>improperly</u> imposed by BPR in violation of law that caused Yelverton to be automatically Suspended <u>prior</u> to a final decision on the merits by the D.C. Court of Appeals.

**17**

77. However, a Fitness Requirement may be imposed, in <u>addition</u> to Suspension, only in <u>extreme</u> cases where there is serious fraud, or harm to the client, egregious disregard of the Bar disciplinary process by failing to participate, or where there is a serious alcohol or drug abuse problem. There are <u>no</u> such facts in the case of Yelverton. <u>In Re Artis</u>, <u>id</u>., at 94-96.

78. Accordingly, with <u>no</u> factual or legal basis for the imposition of a Suspension for any number of days, or for a Fitness Requirement, even if a violation of the Rules is found, there is a substantial likelihood of Yelverton prevailing on the merits with the D.C. Court of Appeals.

(b)  <u>Irreparable Harm</u>

79. An indisputable basis for "irreparable" harm is loss of First Amendment or other Constitutional rights, even for a <u>minimal</u> time. <u>Gordon v. Holder</u>, 826 F.Supp.2d 279, 296 (D.D.C. 2011). First Amendment rights include the right to petition the Courts for a redress of grievances and the right to associate with clients, and must be threatened at the time relief is sought. <u>CFGC v. England</u>, 454 F.3d, <u>supra</u>, at 300.

80. Yelverton is imminently threatened with the loss of his First Amendment right to associate with clients to petition the U.S. Court of Appeals for a redress of "grievances."

(c) <u>Balance of the Equities</u>

81. There could be <u>no</u> harm to other persons by grant of a Stay of Reciprocal Discipline until there is a final decision on the merits by the D.C. Court of Appeals. Thus, the equities favor Yelverton.

(d) <u>Public Interest</u>

82. The enforcement of an action from the D.C. Court of Appeals that is likely <u>not</u> to be found Constitutional, or <u>not</u> in accord with its own precedent, or in excess of its statutory authority, is <u>not</u> in the public interest. <u>Gordon v. Holder</u>, 826 F.Supp.2d, <u>supra</u>, at 297.

83. This is an <u>extraordinary</u> case without any precedent. <u>Honeywell, Inc. v. CPSC</u>, 582 F.Supp. 1072, 1075 and 1078 (D.D.C. 1984), when the case is one of first impression, when serious legal questions are presented by the movant, and when irreparable harm would inflict the movant, the public interest is served by the Staying of Reciprocal Discipline until the D.C. Court of Appeals renders a final decision on the merits.

84. Yelverton commenced an action under 42 U.S.C. 1983 against OBC in Case No. 1:13-cv-314-RWR, and is claiming an exception to <u>Younger</u> Abstention on the basis of "bad faith" and "harassment" by OBC. This case may likely be heard by the Circuit Court of Appeals in the first quarter of 2014. This constitutes another basis for Stay.

WHEREFORE, in view of the foregoing, a Stay of Reciprocal Discipline is requested.

This the 5th day of December, 2013,

Respectfully submitted,

_____/s/_____
Stephen Thomas Yelverton, Pro Se, U.S.C.A. Bar No. 22300
601 Pennsylvania Ave., N.W., Suite 900 South
Washington, DC 20004
Tel. 202-702-6708 Fax 202-403-3801
styelv@aol.com

## CERTIFICATE OF SERVICE

I, Stephen Thomas Yelverton, Pro Se, hereby certify that a copy of this Response to Order to Show Cause was served by Hand Delivery, on December 5, 2013, to the following:

Julio A. Castillo, Esq., Clerk
D.C. Court of Appeals
430 E St., N.W., #209
Washington, DC 20001

Elizabeth J. Branda, Esq., Executive Attorney
Board of Professional Responsibility
430 E St., N.W., Room 138
Washington, DC 20001

Hamilton P. Fox, III, Esq., Office of Bar Counsel
515 Fifth St., N.W., Suite 117
Washington, DC 20001

_____/s/_____
Stephen Thomas Yelverton, Pro Se
U.S.C.A. Bar No. 22300